## RICE, STIX & COMPANY, Appellant, v. JAMES B. SALLY; SARAH H. SALLY, Interpleader.

### In Banc, June 15, 1903.

1. **Married Woman: RIGHT TO SUE.** Wherever the statutes by their terms create a legal estate in the wife, then by virtue of the statute giving her the right to sue in her own name, with or without joining her husband, she may resort to the statutory legal remedy just as any other person.

2. ———: CONTRACT WITH HUSBAND. The Married Woman's Act is broad enough to permit a married woman to contract with her husband, and her contracts with him will be enforced at law, just as if she had contracted with a third person.

3. ———: ———: EXTENT. Under the Married Woman's Acts the husband and wife can deal with each other directly in law as in equity. She is not prohibited any longer from contracting with him, nor he with her.

Rice, Stix & Co. v. Sally.

4. ――――: ATTACHMENT: INTERPLEADING. Where the married woman's right is based on a note and chattel mortgage executed to her directly by her husband conveying to her, without the intervention of a trustee, as security for the payment of the note, certain goods belonging to him, she can interplead in an attachment brought by her husband's creditors. The Married Woman's Acts give her the right to maintain such suit. Nor does it matter in such·case whether the wife's separate property was acquired by descent or devise from a third person, or by grant or gift from, or by contract with, her husband. As to all contracts concerning personalty and all suits and all personal property (except her dower) they can deal with each other as if she were a *feme sole*. (Disapproving Ilgenfritz v. Ilgenfritz, 49 Mo. App. 127, and McCorkle v. Goldsmith, 60 Mo. App. 475.)

5. **Chattel Mortgage**: ABSOLUTE GRANT: DEFEASANCE: INFERENCE. Where a husband by chattel mortgage transferred his stock of goods to his wife for the purpose that she might sell the same and use the proceeds to pay a note which he had executed to her as payee, the chattel mortgage will not be held invalid on the mere technical ground that it also contains a recital that the husband had that day assigned all accounts due him to her, without accompanying it with an obligation on her part to account to him for the same. On the contrary, it will be held that the assignment of the accounts was with power of disposal for the purpose of satisfying the note.

6. **Attachment**: RECORDING MORTGAGE. The recording of a chattel mortgage conveying the property of the mortgagor to others to secure a bona fide debt, in order to be a substitution for an actual change of possession of the goods, and a notice to his other creditors, must be recorded in the county in which the mortgagor resides. Its record in the county in which the goods really are is not a statutory notice to the mortgagor's other creditors, unless he also resides in the same county.

7. ――――: ――――: ――――: ACTUAL POSSESSION. Unless the chattel mortgage conveying the goods to the interpleader was recorded in the county in which the mortgagor resides, it devolves upon the interpleader, in an attachment by other creditors, as necessary to maintain her right to the goods or their proceeds, to prove that "the possession of the mortgaged goods had been delivered to and *retained*" by her, and such change of possession must be actual and visible, regard being had to the situation and character of the property, and, besides, such change must take place before the rights of the mortgagor's other creditors under their attachment writs intervene.

8. ――――: ACTUAL POSSESSION: CASE STATED. The chattel mortgage was not recorded in the county where the mortgagor resided, but in the county where the goods were. It was made by a husband to secure the payment of a note which he had executed to his wife for

money inherited from her father which he had used. She and her husband started in a buggy about four o'clock a. m., and rode twelve or fourteen miles to the store where the goods were, where they arrived about six o'clock. They had breakfast at his brother's, and then about seven o'clock she and her attorney went to the store, and they informed the clerks that the goods were hers. No change was made in the sign, though a new one was prepared, but by whose direction does not appear, nor did any one see it until after the attachment except the maker. A red line was drawn on the books under each account as then made, but nothing was done to open up new books, nor was any notice put on the doors, nor was any change made in clerks, nor was any agreement made with them as to their wages, nor any change as to the manner of doing business, nor was any invoice of the goods made, although an invoice made two days previously led to the making of the mortgage. The attorney stated to some of the villagers that she was in charge, and went on in three or four hours to have the mortgage recorded in that county, and she remained around the store till four or five o'clock and then returned to the town where she lived, and remained there until the attachment was run by plaintiff four days later. *Held*, that there was not that open, visible, actual and continued change of possession of the goods from the mortgagor to his wife which the law requires in order that such change may defeat the attachment of his other creditors.

*Held*, by Fox, J., in a separate opinion, that in determining whether or not the mortgagee took such visible, actual and continuous possession as the law requires in order to shut out intervening parties, due regard must be given to the situation and character of the property; and the evidence showing in this case that the mortgagee had directed the clerks not to sell any goods, that it was the general talk of the village that the goods had been turned over to her, and that two signs with apt words to announce her ownership had been ordered immediately, one by her attorney which had been made in the village but not put up because the paint had not dried, the other in the town where she lived, had been taken to the store and put on the platform, but whether before or after the attachment is not conclusively shown, the question of whether or not there was sufficient evidence to show a change of possession, should have been submitted to the jury, for their determination. *Held*, also, that in disposing of the demurrer to the evidence the court should give to the mortgagee the benefit of the most favorable view of the facts in evidence and the inference that may be drawn from them.

9. ———: REMARKS OF COUNSEL. The counsel for interpleader, in an attachment suit, referred to the attaching creditors as mean and treacherous, as sharpers and speculators (which were matters extraneous to the record), and concluded with an appeal to the prej-

udice of the jury by contrasting the financial standing of the plaintiffs and the interpleader, who was a woman. *Held,* to be unfair and prejudicial, and the trial court refusing to rebuke counsel on proper objection, the cause should be remanded for a new trial.

Appeal from Webster Circuit Court.—*Hon. Argus Cox,* Judge.

REVERSED AND REMANDED.

*Lyon & Swarts, T. M. & C. H. Jones* and *A. Hollingsworth* for appellants.

(1.) The instruction offered at the close of the interpleader's case should have been given, because: (a) The right to interplead, under the statute, being in the nature of an action in replevin engrafted upon a suit by attachment, is a suit at law, whereas whatever rights the wife obtained through the note and the chattel mortgage securing it, being without the intervention of a trustee, are enforcible only in equity. Bank v. Tracy, 141 Mo. 252; Withers v. Shropshire, 15 Mo. 631; Turner v. Shaw, 96 Mo. 22; Crawford v. Whitman, 120 Mo. 144; Pitts v. Sheriff, 108 Mo. 110; Leete v. Bank, 141 Mo. 584; Tennison v. Tennison, 46 Mo. 77; McCorkle v. Goldsmith, 60 Mo. App. 475; Loeb v. Manassas, 78 Ala. 555; Campbell v. Galbraeth, 12 Bush (Ky.) 460; Darcey v. Ryan, 44 Conn. 518; Homan v. Headley, 58 N. J. L. 485; Sines v. Rickets, 35 Ind. 181; Conkling v. Dane, 67 Ill. 357; Garwood v. Garwood, 38 Atl. 954; Dyer v. Bean, 15 Ark. 519; Jenne v. Marble, 37 Mich. 321; Hendricks v. Isaacs, 117 N. Y. 411; Clark v. Patterson, 158 Mass. 388; Knell v. Eggleston, 140 Mass. 202. (b) The chattel mortgage is, in its very terms, fraudulent, within the meaning of section 3397 and 3398, Revised Statutes 1899: First, because the assignment of $1,900 in book accounts was to the grantor's use; and, second, because the conveyance by its terms is not reasonably necessary to secure the debt preferred, and necessarily hinders, prevents and delays the lawful action

of Sally's creditors for one year, and is a fraud upon their rights. State ex rel. v. Benoist, 37 Mo. 500; Bigelow v. Stringer, 40 Mo. 195; Bank v. Winn, 132 Mo. 88. (2) The chattel mortgage was neither recorded in the county where the mortgagor resides, nor was actual, open and notorious possession taken of the merchandise conveyed, within the meaning of section 5178, Revised Statutes 1899. Claflin v. Rosenberg, 42 Mo. 450; Wright v. McCormick, 67 Mo. 429; Knoop v. Nelson Distilling Co., 26 Mo. App. 156; affirmed in 102 Mo. 156; State ex rel. v. Goetz, 131 Mo. 675; State ex rel. v. Hall, 45 Mo. App. 298; Rivercomb v. Duker, 74 Mo. App. 570. (3) The interpleader, in giving to her husband unlimited control over her property, in permitting him to retain and use it in his business from 1887 to 1897, contracting debts on its credit, with no receipt, memorandum, accounting or conversation about it during all that time, can not absorb her insolvent husband's estate to the exclusion of his creditors. The evidence, too, shows that the interpleader took part in her husband's scheme to hinder, delay or defraud his creditors. Riley v. Vaughan, 116 Mo. 169; Holloway v. Holloway, 103 Mo. 282; Humes v. Scruggs, 94 U. S. 227; Ray v. McPherson, 11 Neb. 197; Briggs v. Mitchell, 60 Barb. 288; In re Jones, 6 Biss. 73; Driggs Bank v. Norwood, 50 Ark. 42; Bucher v. Wilson, 84 Va. 813; Knowlton v. Mish, 17 Fed. 198. (4) The trial court erred in refusing to reprimand attorneys Harrison and Dugan, who, in making their address to the jury, used language entirely unwarranted by the record, and most prejudicial to the appellants. Smith v. Western Union Tel. Co., 55 Mo. App. 626; Ensar v. Smith, 57 Mo. App. 584; Haynes v. Trenton, 108 Mo. 124.

*J. B. Harrison* and *H. O. Bland* for respondent; *L. F. Parker* of counsel.

(1) Under the statutes of this State, a married woman is, as to property coming to her by devise or

inheritance, or as the result of her separate labors, a *feme sole,* and such property is her sole and separate property. Her estate in such property is a legal estate, and not a mere equitable one. She is legally entitled to its possession, and may enforce such rights in courts of common-law jurisdiction, and is not remitted to courts of chancery, as she would have been prior to the passage of the present enabling statutes of this State. 2 Bishop on Law of Married Women, 364; Bedsworth v. Bowman, 104 Mo. 44; State ex rel. v. Jones, 83 Mo. App. 151; Hopper v. Hopper, 84 Mo. App. 117; Mills v. Wilson, 87 Mo. App. 145; Clawson v. Clawson's Admr., 25 Ind. 229; Stone v. Gazzam, 46 Ala. 269; Beard v. Dedolph, 29 Wisc. 136; Fenelon v. Hogoboom, 31 Wisc. 172; Brown v. Dressler, 125 Mo. 589. It follows as corollary to this proposition that she may enforce her legal rights, in respect of personal property which is her separate estate, by any appropriate procedure, such as replevin, interplea, etc. (2) Under the statutes of this State, a married woman is absolutely entitled, as her sole and separate property, to any money or any other property which shall have come to her by devise or inheritance, or as the result of her separate labor, and, if such money or property comes to the possession of her husband, and is by him converted to his own use, the law implies the same promises on his part, to repay to his wife such money, or the value of such property, as it would imply had he so converted and used the money or property of any other person. She is his creditor to the extent of such money, or the value of such property, and he owes to her the same duty of payment which he owes to any other creditor, and she is, on the other hand, possessed of all the rights of any creditor. In case he finds himself without sufficient means to satisfy all his debts, he has the same right to prefer her that he has to prefer any creditor, and, on the other hand, she has the same right to avail herself of such preference as any other

creditor has.  Bank v. Winn, 132 Mo. 80; Dice v. Irwin, 110 Ind. 561; Faddis v. Woollomes, 10 Kas. 56; Hill v. Bowman, 35 Mich. 191; Jordan v. White, 38 Mich. 253; Stanley v. Bank, 115 N. Y. 122.    (3)    At common law a married woman could not be estopped by acts *in pais* because of her disabilities.  The removal of these disabilities has also removed the reason which relieved her at the common-law from the effect of estoppels; but the removal of such disabilities only serves to place her on the same footing as others, standing in the same relation to the subject-matter of the estoppel.  As a creditor of her husband, she has the same right to treat him leniently as any other creditor has, and especially is this true where the conversion of her money and property has taken place without her assent in writing, as required by the statute.    James v. Groff, 157 Mo. 402; McGuire v. Allen, 108 Mo. 403; Winn v. Riley, 151 Mo. 61; Alkire Grocery Co. v. Ballenger, 137 Mo. 369.    (4)    The question of delivery of possession, as well as the question of fraud, or an intent to hinder and delay creditors, is one of fact, and the finding of a jury is conclusive.    Sharpless v. Derr, 62 Mo. App. 359; Wachtel v. Ewing, 82 Mo. App. 594; Hibbard v. Heckart, 88 Mo. App. 544.

GANTT, J.—This is a proceeding wherein the plaintiffs are attaching creditors and certain goods were attached as the property of defendant James B. Sally, and his wife, Mrs. Sarah H. Sally, interpleads therefor.    The action was commenced in the circuit court of Phelps county, and a similar one was begun in Dent county, and the venue in each was changed to Webster county.    In the latter county the two suits were consolidated.

Mrs. Sally, the wife of the defendant in these attachments, interpleaded for the goods seized by the sheriff, and grounds her claim thereto upon a chattel

Vol 176 mo—8

mortgage executed to her by her husband, of date October 21, 1897, to secure the payment of a promissory note executed on that date by her husband, James B. Sally, in her favor, for $10,500, and payable one year after date.    By the terms of said mortgage, Mrs. Sally was to take immediate possession of all the stock of goods and personal property therein described, and she was given power to sell at retail or wholesale and apply the proceeds to the payment of said note, and the balance, if any, to her husband, James B. Sally, or his representatives.

James B. Sally, the mortgagor, resided in Phelps county, Missouri; the stock of goods was situated at Lecoma, a village in Dent county.    The mortgage was not recorded in Phelps county, but was recorded in Dent county, October 22, 1897.    On October 25, 1897, the sheriff of Dent county, by virtue of writs of attachment, one of which was issued in the case of Rice, Stix & Company v. James B. Sally, levied upon and seized the said stock of goods.    The said goods were afterwards sold by order of the judge of the circuit court in vacation.    The village of Lecoma is in Dent county, twelve or fourteen miles from Rolla, in Phelps county. Defendant Sally and his wife, the interpleader, resided in Rolla at the time the chattel mortgage was executed and the writs of attachment were sued out and levied.

On a trial before a jury in the circuit court there was a verdict for the interpleader, and the plaintiffs in attachment have appealed to this court.

The interpleader was Miss Sarah H. Bowman prior to her marriage to defendant Sally, and claims the property to satisfy her mortgage, which she alleges was given to secure an indebtedness to her by her husband, growing out of his receiving and appropriating to his own use her distributive share in the estate of her father, James R. Bowman, who died in 1894, leaving a will and naming his son, W. P. Bowman, and James B. Sally, defendant, as his executors.

To substantiate her claim and show the considera-
tion of the note described in the chattel mortgage, inter-
pleader introduced in evidence said will. The will, so
far as it is material to this controversy, bequeathed cer-
tain lands and moneys to Mrs. Sally.

She next read, over the objection and exceptions
of the attaching plaintiff, receipts of hers filed with a
settlement made in the probate court by said executors,
from which it appeared she acknowledged she had re-
ceived of said executors $6,211.02, and advancements
in her father's lifetime amounting to $3,255. Other wit-
nesses testified to admissions made by James B. Sally,
the husband of interpleader, over the objections and ex-
ceptions of plaintiff, to the effect that he had received
the purchase money for certain lands belonging to his
wife and sold by her and her husband, to the amount
of $6,000.

Mrs. Sally testified that in truth and in fact she
never received any of these moneys from the executors
of her husband.

Other witnesses, Harrison, Cowan and Pinto, tes-
tified to admissions by James Sally, her husband, that
he had received about $6,000, the proceeds of the sale
of his wife's realty. Mrs. Sally testified that no ac-
count of these moneys was ever kept between her and
her husband; that she never at any time made any de-
mand for it. No interest was paid on it or requested,
and no separate investment of it was ever made for
her benefit, and but for her husband's embarrassment
she would not have demanded it. She supposed it was
all right, and never inquired about it. In April, 1897,
the defendant Sally was very slightly indebted to the
wholesale trade, and his credit was excellent as re-
ported by commercial agencies, but according to the evi-
dence for interpleader he was indebted to his wife and
other relatives to the amount of nearly $20,000. He
purchased, during 1897, large bills of merchandise, with
the result that, on October 1, 1897, he was indebted in

the sum of $20,000 to the trade.   By his chattel mortgage and other dispositions on the 21st of October he had secured his wife and brother-in-law to the full amount of his visible property and left nothing to satisfy his wholesale creditors for the merchandise bought of them that year.   He and his wife had conveyed all his real estate.

On October 21, 1897, James B. Sally and Mr. J. B. Harrison, a member of the Rolla bar, went to Lecoma in Dent county, to Sally's store.   Mr. Harrison learned that day that Sally was hopelessly involved and Harrison suggested to him that he should secure his wife the moneys he had received of her estate.

Sally and Harrison returned to Rolla that evening, arriving at about 9 o'clock at night.   Prior to that evening neither Mrs. Sally, the interpleader, nor Sally, nor their attorney Harrison, had any intimation that Sally's creditors intended to push the collection of their claims.   It appears, however, that on the 20th of October, 1897, Sally had an invoice taken of his Lecoma stock.   The usual time for taking same had been in March.

The interpleader, Sarah H. Sally, had already retired for the night, but at the urgent request of her husband she arose, dressed and went to the residence of Mr. Harrison.   The affairs of Sally were gone over at full length, Mrs. Sally being present during the interview, taking part therein and fully appreciating all that was being done.   The items of the alleged indebtedness, running from 1887 to 1897, were gone over, and David Cowan, circuit clerk and recorder of Phelps county, who was present during this interview, at the request of attorney Harrison, drew the note and chattel mortgage, the note being made by J. B. Sally to the order of Sarah H. Sally, and for the sum of $10,500, dated October 21, 1897, and being payable one year after date. The note was made payable twelve months after date at Sally's suggestion, as "he thought she could handle

the property in a year's time and not have to close it
out." The chattel mortgage, direct from J. B. Sally
to Sarah H. Sally without the intervention of a trustee,
conveyed such goods, wares, and merchandise as were
covered by the specific items of an invoice, dated Octo-
ber 20, 1897, and the office fixtures in the Lecoma store,
aggregating about $9,000, and gave Mrs. Sally the right
to sell at retail, wholesale, or in any other manner, with-
out notice or publication of any kind of the time and
place of sale, all of the said merchandise, and to apply
the proceeds toward the payment of her debt, the bal-
ance to be returned to James B. Sally, or his legal rep-
resentatives. The mortgage in term recites, and the
fact is, that accounts due James B. Sally, growing out
of the operation of the Lecoma store, amounting to
$1,900, had been made out and had that day been duly
assigned by James B. Sally to Sarah H. Sally, and had
been delivered to her.

During the same night, and at Mr. Harrison's res-
idence, Mr. and Mrs. Sally joined in the execution of
a deed of trust for $3,000, which deed came into the
possession of William P. Bowman a week or two after
said night, although William P. Bowman had not seen
James B. Sally for two or three months prior to said
night, and had never asked him for such a deed of trust,
nor had he had any previous arrangement or agreement
with him concerning it. It appears that the inter-
pleader on the same night executed to attorney Harri-
son a power of attorney, the extent of which, however,
does not appear, as the power of attorney was not in-
troduced in evidence. Mr. Harrison acted as attorney
for both Mr. and Mrs. Sally from the start, and was
acting in that capacity at the time of the trial.

It further appears that Sally delivered and in-
dorsed over to Mrs. Sally a note dated September 4,
1897, due one year after date, for the sum of $4,207.60,
to secure Mrs. Sally as indorser on two of her husband's
notes due the State Bank of Rolla, the two notes ag-

gregating the sum of $3,000, Mrs. Sally further agreeing to pay two notes due the National Bank of Rolla, aggregating $950, on all of which notes Sally was liable, Mrs. Sally further agreeing that if any surplus remained after paying the above four notes to the State Bank of Rolla, she would pay over such surplus to John P. Kaine and herself. The date when Sally delivered this note to his wife does not appear, but it is admitted that the note was filed with the State Bank on the 23rd day of October, 1897. Mrs. Sally in her interplea alleges that the sheriff seized said paper, but the sheriff's return shows no such seizure, and in fact none was made.

Upon her return to her home that night, Mrs. Sally stated to her mother that Mr. Sally wanted her to go to Lecoma and get the property in her name before the St. Louis parties got there. Shortly after midnight of the same day Mr. and Mrs. Sally, together with their attorney, Harrison, drove to Lecoma, arriving there about daylight of October 22, 1897. Mrs. Sally went under these circumstances because her husband and attorney Harrison told her to go and insisted upon her going.

The chattel mortgage was recorded on October 22, 1897, in Dent county, but was not recorded in Phelps county, where the defendant, Sally, and his wife, the interpleader, resided.

Mrs. Sally and attorney Harrison told the clerks in charge of the store that she (Mrs. Sally) was the owner thereof. It appears that Mrs. Sally remained about the store for some hours and returned to Rolla that same night, reaching there at about 8 o'clock in the evening, and never returned to Lecoma until after the property had been levied upon. What the sales were Mrs. Sally did not know. It further appears that the interpleader did not close the store for any purpose whatever, and that without losing a moment's time the store was run up to the time the attachments were

levied at 5:30 p. m. on the 25th day of October. The same three clerks were continued, no arrangements whatsoever having been, made with them about salary, and no one of them in particular or anyone else being put in charge for her. The old books were continued in use, no invoice was taken of the stock of goods by Mrs. Sally or by anyone for her at any time. There was no sign, poster, or notice to indicate a change of ownership. The evidence tended strongly to show that nothing was done to indicate to the public, or advise or inform the public, that there had been a change in the ownership or possession of the stock of goods.

This was the status at 5:30 p. m. on Monday, October 25, 1897, four days after the execution of the mortgage, at which time the merchandise and accounts were attached by Sally's creditors, among them the plaintiff.

Other facts, and the several instructions given by the court, will be noted in the opinion as occasion may require.

I. The first contention of the plaintiff raises a question of procedure and practice.

Their position is that as the right to interplead in an attachment case is strictly statutory and legal, it can not be maintained where the interpleader has not a strictly legal right, and that inasmuch as Mrs. Sally, the interpleader in this case, acquired whatever right she has to the attached property through the chattel mortgage of her husband to her without the intervention of a trustee, it is purely equitable, and hence she can not recover in this form of action.

An interplea under our statute is in the nature of an action of replevin engrafted upon the suit by attachment. [Burgert v. Borchert, 59 Mo. 80; Bank v. Tracey, 141 Mo. 261; State ex rel. v. Barker, 26 Mo. App. 487.]

An interplea being in its essential characteristics

an action of replevin, the legal title or right to the imme-
diate possession must exist in the interpleader.

We do not understand plaintiff to contend that in
no case can a married woman interplead for her per-
sonal property, in which she has a separate statutory
legal estate in any of the ways defined by our Married
Woman's Acts, but simply that where her title thereto
is equitable only, she can not interplead at law in an
attachment case.    By thus discriminating we may avoid
seeming conflicts in judicial utterances.

We are thus brought to the question, what was the
nature of Mrs. Sally's title to the attached goods under
her chattel mortgage from her husband?    Did it con-
vey her a strictly legal estate or did it create merely
an equitable lien, which the courts would enforce and
protect in equity?

It was a maxim of the common law that the hus-
band and wife could not contract with each other dur-
ing coverture.    The reason assigned was that they
were one person in law and that it would be absurd for
any person to contract with himself.    The disability
attached to both husband and wife.    However unsat-
isfactory this reason may appear in view of the fact
that the same law recognized the validity of a deed or
devise to the wife and thus conceded they were two dis-
tinct persons, it has been too long settled to be over-
turned by the judiciary.    While this was the rule at
law, the courts of equity at an early period recognized
the separate existence of the wife and secured to her
her separate estate, and equitable rights (Tennison v.
Tennison, 46 Mo. 77), and though void at law, an abso-
lute conveyance of real or personal property from the
husband directly to his wife was good in equity and
sufficient, so far as the form was concerned, to divest
the equity of the husband in such property and to vest
the same in the wife as against all persons, when such
transfer was fairly made upon a meritorious or valua-
ble consideration.    [Wallingsford v. Allen, 10 Pet. 583;

Lady Arundell v. Phipps, 10 Ves. 146; Shepard v. Shepard, 7 Johns. Ch. 57.]

And such was the recognized doctrine generally in all of the States of the Union, prior to the passage of the various married women's acts. The great and sweeping changes made, both in this country and England, by this character of legislation, is too well known to require any recapitulation. While similar, each State has made its own changes, and a reference to the statutes of each is necessary to understand the construction of their courts.

They all evince a determination to render the husband and wife independent of each other *as to their property rights,* and to render the wife capable of contracting at law as well as in equity as if she were sole. But in some of them it is expressly provided that the husband and wife are not thereby permitted to contract with each other. Our Missouri statute on the subject governing this case is section 6864, Revised Statutes 1889, and remains unchanged in the revision of 1899, section 4335.

By it, "a married woman shall be deemed a *feme sole* so far as to enable her to carry on and transact business on her own account, to contract and be contracted with, to sue and be sued, and to enforce and have enforced against her property such judgments as may be rendered for or against her, and may sue and be sued, at law or in equity, with or without her husband being joined as a party." This section has been construed on various occasions, but the exact point now under consideration has never been decided, so far as the writer can find, by this court; but has been by both of our Courts of Appeals.

In Ilgenfritz v. Ilgenfritz, 49 Mo. App. 127, the Kansas City Court of Appeals, after quoting sections 6864 and 1996, Revised Statutes 1889, in a case in which the wife had sued her husband in equity and the point was made that her remedy if any was at law by re-

plevin, said: "In our opinion neither of these statutes authorizes the wife to sue the husband at law. They give her the right to sue without joining her husband as a party plaintiff. She may bring her action independent of her husband, and a third party may sue her without joining the husband as a party defendant. But she is not empowered to sue her husband. The unity of husband and wife is not destroyed by these statutes. They are, as before these statutes, one legal entity in the eye of the law, except as they are separated by the express provisions of the statute, or necessary implications arising from such provisions. We are cited to the cases of Larison v. Larison, 9 Ill. App. 27, and Wilson v. Wilson, 36 Cal. 451, where the husband is sued at law by the wife. In the former case, the action is for injuries to her property; and, in the latter, on a promissory note. But in each case a statute is cited, giving authority in express words for either to sue the other."

In McCorkle v. Goldsmith, 60 Mo. App. 475, the husband sued his wife on an appeal bond and the question was whether a court of law would enforce a contract between husband and wife. The answer involved the construction of section 6864, Revised Statutes 1889, the one we are now considering. It was urged that this section, without any restriction or limitation whatever, authorized a married woman to contract and be contracted with and to sue and be sued in all courts as if she were a *feme sole* and that this extends to the making and enforcement of contracts with her husband. But, said the Court of Appeals, even though this construction be adopted, we can not see our way clear to an affirmance of the present judgment. At common law husband and wife could not contract with each other for the reason that they were regarded as one person. The disability rested on both alike. Therefore in this case, if the complete emancipation of the wife be conceded, the disability remains with the hus-

band.   A contract which a court of law will recognize
and enforce must be one entered into by two or more
persons, who are *sui juris* and capable of contracting
with each other.   This disability of the husband was
stated and recognized by the New York Court of Ap-
peals in the case of White v. Wager, 25 N. Y. 333.   It
was there contended that the statute permitted husband
and wife to contract with each other.   That court *de-
nied* this, and held that, to have such an effect, the dis-
ability of the husband would also have to be removed,
and that nothing short of this. would entirely destroy
the marital unity of the parties or enable them to con-
tract with each other."   After observing that if the
contention of plaintiff were sound then section 6864 re-
pealed section 6868, the St. Louis Court of Appeals
concluded:   "In our opinion it was the intention of the
Legislature to confer upon a married woman the abso-
lute freedom of contract as to all the world, *except her
husband;* also the right to the possession and control
of her property, subject to such use and enjoyment by
her husband as would necessarily result from the mar-
ital relation, and also the legal remedies for the protec-
tion of her property and the enforcement of her con-
tracts (except those made with her husband) that are
afforded other persons who are *sui juris.*   [Major v.
Holmes, 124 Mass. 108.]"

In Lindsay v. Archibald, 65 Mo. App. 117, SMITH,
P. J., after reviewing Ilgenfritz v. Ilgenfritz, 49 Mo.
App. 127, McCorkle v. Goldsmith, 60 Mo. App. 475 and
White v. Wager, 25 N. Y. 333, in a case in which a hus-
band sued his wife's administrator, said:   "Accord-
ingly, it is clear from these rulings, that the husband
can no more sue the wife, or *the wife the husband,* in
an action at law, since the enactment of said Married
Woman's Statutes, than he or she could before.   The
disability of the husband as well as that of the wife,
has not been removed by said enabling statutes.   So

the plaintiff could not have sued his wife in an action at law, on a contract, while she was living.''

None of these cases deny, but all recognize the familiar doctrine in this court, that in equity husband and wife may contract with each other, and that courts of equity, where the equities require it, will enforce such contracts. [Turner v. Shaw, 96 Mo. 22; Clark v. Clark, 86 Mo. 114; Chapman v. McIlwrath, 77 Mo. 46; Morrison v. Thistle, 67 Mo. loc. cit. 600-1.]

The decisions of this court construing section 3296, Revised Statutes 1879, the act of March 25, 1875, in Blair v. Railroad, 89 Mo. 383, Brown v. Bowen, 90 Mo. 184, Broughton v. Brand, 94 Mo. 169, Gilliland v. Gilliland, 96 Mo. 522, do not reach the exact point under consideration. In neither of them was the validity of a contract between husband and wife at law, since the enactment of our Married Woman's Acts, *the point in judgment,* notwithstanding the general language used.

The question is one on which judicial opinion ou similar statutes is by no means uniform. Thus, in Massachusetts, while the statute of 1874, ch. 184, s. 1, Pub. Sts. ch. 147, s. 2, permits a married woman to make contracts *in the same manner as if she were sole,* the Supreme Court of that State held that this act gave no authority to husband and wife to contract each with the other at law; that their legal incapacity to thus contract remained, as at common law, notwithstanding this enabling statute. [Kneil v. Egleston, 140 Mass. 202.]

In Kentucky, section 49 of the Civil Code provided that ''where a married woman is a party, her husband must be joined with her, except that when the action concerns her separate property, she may sue alone, and *where the action is between herself and her husband,* she may sue or be sued alone,'' and the Court of Appeals in Matson v. Matson, 61 Ky. 262 (4 Metcalfe), held that this gave no new right of action to the wife, but its only effect was to dispense with a next friend in those cases in which the action concerned the sepa-

rate estate of the wife, or where she sued in equity to enforce some equitable right against her husband.

In New York the act of 1860 provided in section 7 that "any married woman may bring and maintain an action in her own name, for damages, against any person or body corporate, for any injury to her person or character, the same as if she were sole; and the money received upon settlement or judgment shall be her sole and separate property." These words were admitted to be broad enough to cover an action by the wife against her husband for assault and battery or slander, but it was ruled she could not sue her husband under this statute. [Longendyke v. Longendyke, 44 Barb. 366.]

In Iowa a statute, in all respects similar to the Kentucky act above quoted, received a contrary construction to that given by the Kentucky Court of Appeals (Jones v. Jones, 19 Iowa 242), and the Indiana court reached the same conclusion that the Iowa court did. [Scott v. Scott, 13 Ind. 225.]

The reason which impelled the Court of Appeals of New York and our Courts of Appeals to hold that statutes which simply give the wife's property to her, as her separate estate, and permit her to contract and be contracted with, sue and be sued, do not go to the extent of permitting husband and wife to contract with each other, is that they only render her competent to contract and do not remove the disabilities of the other party to such contract, to-wit, the husband, who at common law was incompetent to contract at law with his wife and have it enforced in a court of law, but relegated each to a court of equity to enforce their agreements with each other.

The argument of Judge Denio in White v. Wager, 25 N. Y. 328, is the basis of these decisions, and is contained in the following excerpt from his opinion: "But it is argued that the power in terms given to a married woman by the act of 1849, 'to convey and devise real

and personal property,' 'as if she were unmarried.'
embraces all manner of conveyances, and necessarily
includes any which she might make to her husband.
No doubt there was an intention to confer upon the
wife the legal capacity of a *feme sole,* in respect to
conveyances of her property, but this does not prove
that she can convey to her husband, for no such ques-
tion could possibly arise in respect to a *feme sole,* there
being no person to whom, in respect to conveyances
made by her, the rule of common law could apply.
By assimilating the case of a wife to that of an unmar-
ried woman, the Legislature merely meant to say that
she should have the same power as though she were not
under disability of coverture. Taking away that dis-
ability, she would have power to make all such convey-
ances as were not forbidden by special provisions of law;
but such general statutes are never understood to over-
reach particular prohibitions, founded on special rea-
sons of policy or convenience. Corporations can not,
in general, take title to lands by will. The removing
of the disabilities of *femes covert* would not allow them
to make a devise to a corporation not authorized to
take. It is not the disability of the wife alone which
would, by the common law, render void her conveyance
to her husband. *The husband is as much disabled to
take under such conveyance as she was to convey.*
Therefore, to render the conveyance valid, *the hus-
band's disability, as well as that of the wife, must be
removed;* but, as has been remarked, there is no lan-
guage in these acts, and nothing in apparent intention,
which looks to the removal of the disabilities under
which he labored." Again, the learned jurist says
elsewhere: "We would not expect to find, in a law,
passed professedly to shield the property of married
women from control of their husbands, *a provision mak-
ing* it more easy for the latter to acquire such control.
Beyond all doubt the greatest peril to which the sepa-
rate estate of the wife is exposed, is her disposition to

acquiesce in placing the title to it in the hands of her husband. This the common law prevented to a certain extent by rendering her direct conveyance to him void.''

From these fundamental maxims of the common law, Judge Denio and our own Courts of Appeals reached the conclusion that as a contract in law requires two *competent persons* to agree, they argue that at common law, the husband is under disability, as much as the wife, to make a contract with her during coverture, and the removal of the wife's disability only enables her to contract with third persons who are themselves competent, and not with her husband whose disabilities have not been removed, but continues incompetent to contract with her.

Over and against these cases, which counsel for interpleader concede correctly state the rule at common law, the interpleader insists that our Married Woman's Acts, sections 4335 and 4340, Revised Statutes 1899, remove all the disabilities of a married woman, and that it was the intention of the said acts to make legal those rights which under our law prior to their enactment were merely equitable and could not be maintained at law, as by interplea in an attachment case. In support of their argument counsel cite State ex rel. v. Jones, 83 Mo. App. 151. But in that case, the wife owned the personal property *at the time of her marriage* and it was levied upon and sold as the husband's after marriage. The execution creditor gave the sheriff an idemnifying bond. The wife brought her suit on the bond in the name of the State and the sole question was whether it was her separate statutory estate, and it was held that it was, and she could maintain the suit. Obviously it does not affect the question now before us. Certainly the Court of Appeals did not so regard it, as they make no reference whatever to their previous decisions as to her rights growing out of contracts during coverture, neither did counsel on either side.

Hopper v. Hopper, 84 Mo. App. 117, is also cited.

That was an action in replevin by a widow against the heirs and executors of her deceased husband to recover personalty *given* to her by her husband; and no doubt could exist as to the right of the husband to give her the property and treat it as her own. Her action was against his legal representatives and the rights of creditors were not involved.

In Mayfield Woolen Mills v. Wilson, 87 Mo. App. 145, an attachment suit was brought against one Wilson as surviving partner, and a stock of goods in a store run in the name of the wife of Wilson was attached and she interpleaded therefor. Her right to do so was challenged by the attaching creditor, and no reference is made to her right so to do, but the jury found, and its verdict was approved by both the circuit and appellate court, that the defendant Wilson had borrowed from his wife, the interpleader, certain moneys which she had inherited from her mother and invested it in land in her name. She sold this land and loaned the proceeds to her husband's firm; when afterwards he discovered the firm would be compelled to cease business, the firm transferred to Mrs. Wilson two notes secured by a chattel mortgage, paid her $300 in cash, and afterwards paid her $300 more, or $900 in the aggregate, to reimburse her for her separate moneys which they had used. She bid in the mill under the mortgage, made $700, sold the mill for $1,300, and with these moneys bought the goods which were attached. Having repaid his wife the moneys borrowed of her which were her legal and statutory separate estate, the wife's interest in these moneys was as if she had remained continuously in possession of them and her investment of them in the goods attached did not change them into a mere equity, but the goods were her separate legal estate, and when they were levied on by a third person to satisfy her husband's debt, we have no doubt whatever that the statute, section 4335, Revised Statutes 1899, gave her the right to sue therefor,

in her own name, without joining her husband, and
that the circuit court and Court of Appeals correctly
and necessarily so held, although no point was made as
to her right to do so by an interplea.

The more recent cases by the St. Louis Court of
Appeals, decided since the preparation of the brief by
counsel for respondent interpleader, to-wit, Grimes v.
Reynolds, 94 Mo. App. 576, and Grimes v. Reynolds,
94 Mo. App. 589, and Beagles v. Beagles, 95 Mo. App.
338, disapprove both Lindsay v. Archibald, 65 Mo. App.
117, and McCorkle v. Goldsmith, 60 Mo. App. 475, and
follow Locke v. McPherson, 163 Mo. 493, and Winn v
Riley, 151 Mo. 61, and hold that a proper construction
of our Married Woman's Acts, supra, leads to the com-
plete emancipation of the wife from her matrimonial
bonds so far as her property rights are concerned in
law, as well as in equity, and that she may contract
with her husband and sue and be sued by him at law.

Plaintiff, we think, concedes that wherever the
statute by its terms creates a legal estate in the wife,
then by the right to sue in her own name with or with-
out joining her husband, she may resort to the statutory
legal remedy just as any other person, and so the only
question remaining is, what is the nature of the right
which a wife acquires by virtue of a chattel mortgage
executed directly to her by her husband to secure a
note made by him to her?

That is this case.

Mrs. Sally's right to the goods seized by the sheriff
under plaintiff's attachment depends entirely upon the
validity of the chattel mortgage executed to her by her
husband, the defendant in the attachment, and her pos-
session thereunder. That this transfer was enforcible
in equity, if not made to defraud creditors of her hus-
band, is not questioned; but can it be sustained at law,
and in this form of procedure?

After a careful consideration we are of the opin-
ion that the intention of our Legislature was to remove

Vol 176 mo—9

the disabilities under which a married woman labored at common law so as to permit her to contract and be contracted with, sue or be sued, and that the language used, *being entirely without exception,* is broad enough to permit her to contract with her husband, and that her contracts with him will be enforced at law, just as if she had contracted with third persons, and this we think is the weight of judicial opinion in other States where statutes no broader than ours have been con- strued.

Her right, then, being a legal one, we see no obsta- cle to her maintaining replevin or interpleading in an attachment case. [Carney v. Gleissner, 62 Wis. 493; Beard v. Dedolph, 29 Wis. 141; Fenelon v. Hogoboom, 31 Wis. 172.]

Profound as our respect is for the judicial utter- ances of Judge DENIO and for the opinions of our brethren of the Courts of Appeals of this State, we are loth to accept the chief premise upon which they bottom their opinions, that the removal by statute of all the disabilities of a wife to contract, does not enable her to contract and receive a conveyance or mortgage from her husband. While the common law did not permit the husband and wife to contract with each other, because one person in law, there was a marked distinction between the competency of the two to con- tract with third persons as well as each other. No disability attached to the husband by reason of his marriage, but he remained at liberty to contract and be contracted with, save as to his wife, whereas the wife was wholly incompetent to do so. It was the wife who was under dominion and she constituted one of the exceptions to the general rule that all persons are competent to contract, and it was out of solicitude for the wife that the law prohibited the husband from con- tracting with her, save under the protection of a court of equity. But now that the statutes dissolve the unity of husband and wife as to the property rights enumer-

ated in our Married Woman's Acts, and make the wife a *feme sole,* and as the husband could always have contracted with a *feme sole* and granted his property after marriage as before, with the exceptions that he could not receive a deed directly from her, and could not dispose of her inchoate dower, there remains no obstacle to their dealing directly with each other at law as well as in equity. That such was the purpose of these Married Woman's Acts, we have no doubt whatever, and we think that releasing the bonds which bound the wife necessarily left the husband free of the disability which rested on him, solely and only because the law rendered his wife incompetent and when she was rendered *sui juris* nothing remained of the common rule as to their incapacity to contract. It follows that the cases of Ilgenfritz v. Ilgenfritz, supra, McCorkle v. Goldsmith, supra, and the other cases cited which followed them must be disapproved, and held not to be a correct construction of section 4335, Revised Statutes 1899, and that in our opinion a wife can interplead in an attachment suit to recover her separate property whether acquired by descent or devise from a third person, or by grant or gift from or by contract with her husband, and we approve Grimes v. Reynolds, and Beagles v. Beagles, supra.

We think, however, that White v. Wager, 25 N. Y. 328, and Winans v. Peebles, 32 N. Y. 423, might have been under the New York statutes correctly decided, because by express statute a wife in New York could not convey her real estate without joining with her husband and he could not convey to himself. It was for this reason only that the writer dissented from Bank v. Hageluken, 165 Mo. 443, being of opinion that the conveyance act was not repealed by the general language of section 6869.

II. We proceed to examine the remaining assignments of error. At the close of the interpleader's evidence, the plaintiff prayed the court to give a peremp-

tory instruction in the nature of a demurrer to the evidence. Three grounds are advanced why this instruction should have been given. Two of them are based upon the terms of the chattel mortgage which plaintiff insists show it to be fraudulent on its face. The first of these is the recital in the chattel mortgage that the defendant, J. B. Sally, had that day assigned to Sarah H. Sally "all accounts which are now due to said J. B. Sally by reason of operating and conducting a merchandise business at said place (Lecoma) which now appear on his books of account and ledger of said business amounting to $1,900," and for various amounts against divers persons because said assignment was for J. B. Sally's use, because counsel insist that the defeasance clause was never finished, and the $1,900 of accounts were transferred to Mrs. Sally, defendant's wife, with no obligation on her part to account for the same. We are not inclined to give the mortgage such a technical construction as this. If it is not invalid for other reasons, we think the granting words conveyed these accounts as did the express assignments of each by the defendant, and that the power of disposal for the purpose of satisfying the note is fairly included in the general words of sale contained in the mortgage.

Neither do we think there was any failure of proof as to the identity of the goods attached with those covered by the mortgage. The mortgage conveyed all the dry goods, groceries, etc., kept in stock at the storehouses and warerooms of defendant Sally at Lecoma, Dent county. The proof was there was but the one store at Lecoma and the clerks testified the sheriff attached all the goods in the store.

It is further insisted that upon the undisputed evidence in behalf of interpleader at the close of her case, there was no such change of possession as our statute of fraudulent conveyances, section 3404, Revised Statutes 1899, requires, and notwithstanding defendant was indebted to his wife, the interpleader, to the amount

of his note secured by said chattel mortgage, said mortgage was invalid as against the plaintiffs, who are attaching creditors, and it was the duty of the court to declare the same fraudulent as a matter of law.

Section 3404, supra, provides that: "No mortgage or deed of trust of personal property hereafter made shall be valid against any other person than the parties thereto, unless possession of the mortgaged or trust property be delivered to and *retained* by the mortgagee or trustee or *cestui que trust,* or unless the mortgage or deed of trust be acknowledged or proved and recorded *in the county in which the mortgagor* or grantor resides, in such manner as conveyances of land are by law directed to be acknowledged or proved and recorded, or unless the mortgage or deed of trust, or a true copy thereof, shall be filed in the office of the recorder of deeds of the county where the mortgagor or grantor executing the same resides, and in the case of the city of St. Louis, with the recorder of deeds of said city, or, where such grantor is a non-resident of the State, then in the office of the recorder of deeds of the county or city where the property mortgaged was situated at the time of executing such mortgage or deed of trust; and such mortgage or deed of trust, or copy thereof, may be so filed, although not acknowledged, and shall be as valid as though the instrument were fully spread upon the records of the county, or, in case of the city of St. Louis, upon the records of said city, in the office of the recorder of deeds; and such instrument, when acknowledged and recorded, or when the same, or a copy thereof, shall have been filed, as above provided, shall thenceforth be notice of the contends thereof to all the world."

Constructive notice is altogether the creature of statutory enactment, and when it is invoked must be shown to be at least a substantial compliance with the statute. It will be observed that the statute requires that in order to be notice to those to be affected by it,

and to dispense with an actual transfer of the possession, *a chattel mortgage must be recorded in the county in which the mortgagor resides,* though the mortgaged property may be situated in another county. [Fahy v. Gordon, 133 Mo. 414; Bevans v. Bolton, 31 Mo. 437.]

The evidence in behalf of interpleader, uncontradicted by plaintiffs, was that defendant, James Sally, resided in the city of Rolla in Phelps county, and the mortgaged property as shown by the instrument itself was situated at Lecoma in Dent county.

It is then clear that the recording of this chattel mortgage in Dent county conveyed no notice whatever to the creditors of said James Sally, among whom are the attaching plaintiffs, and was not a substitute for an actual change of possession.

It devolved, then, upon interpleader, to maintain her right to recovery by proving "that the possession of the mortgaged goods had been delivered to and retained" by her, and it is the settled law that such change of possession must be actual and visible, regard being had to the situation and character of the property, and such change must take place before the rights of other parties intervene. [Bank v. Powers, 134 Mo. 446; Dobyns v. Meyer, 95 Mo. 132.]

We are thus brought to a consideration of the evidence as to the taking and retaining possession of the stock of goods at Lecoma by Mrs. Sally, the interpleader.

It has been repeatedly adjudged by this court that the actual, and continued change of possession contemplated by the statute must be open, notorious and unequivocal, such as to apprise the community or those accustomed to deal with the party, that the goods have changed hands and that the title has passed out of the seller and into the purchaser. [Claflin v. Rosenberg, 42 Mo. 439; Bishop v. O'Connell, 56 Mo. 158; Lesem v. Herriford, 44 Mo. 325.]

While the foregoing cases construed the section gov-

erning conveyances as between vendor and vendee, the same evidence of change of possession has been adjudged essential as between a mortgagor and mortgagee in a chattel mortgage.   [Bank v. Powers, 134 Mo. 446.]

Whatever the rule in other States, it is the law of this State that when the undisputed facts show there was no such change of possession and the mortgage was not recorded before the rights of attaching creditors intervened, it is the duty of the courts to declare the transaction fraudulent and void in law, irrespective of fraud in fact.   [Wright v. McCormick, 67 Mo. 426; Bigelow v. Stringer, 40 Mo. 195; Stewart v. Bergstrom, 79 Mo. 524.]

What, then, are the undisputed facts as to the change of possession?   Mr. Harrison, the attorney who advised and superintended the giving of the mortgage, testified that it was drawn and acknowledged at his residence in Rolla, about ten or eleven o'clock of the night of October 21, 1897; that about four o'clock next morning, J. B. Sally, the defendant, and his wife, the interpleader, started in one buggy, and Mr. Harrison in another, for Lecoma, where the stock of mortgaged goods was situated.   The three reached Lecoma about six o'clock that morning, and went to the house of John Sally, a brother of defendant.   They ate a hurried breakfast, and Mrs. Sally and Mr. Harrison went to the store.   The defendant had three clerks in charge of the store:   John Sally, his brother, Pat Smith and George Martin.   Mr. Harrison remained in Lecoma that morning from an hour and a half to two hours, and then rode on to Salem, the county seat of Dent county, to record the mortgage, and came back about four or five o'clock that afternoon.   Asked if change was made in the clerks, he answered:   "No, sir, I didn't think it was necessary to make any change in the clerks.   I made arrangements with them to stay there for Mrs. Sally.   The same ones that Mr. Sally had there."

The doors were not closed, and no invoice was ta-

ken. These same clerks had been running the store the day before, and did not stop to make any invoice.

"Q. You didn't put up any signs showing it was Mrs. Sally's store? A. No, sir.

"Q. Did you put up a written notice? A. No, sir.

"Q. Did you notify the people there at Lecoma that Mrs. Sally had taken possession of the store? A. Yes, sir.

"Q. Who did you notify? A. I don't remember the names of all; I remember speaking to Mr. Lenox about it.

"Q. There was nothing done except what you said to the parties on the street there; there was nothing to indicate to the public that there was any change in the proprietorship or that there had been any change in ownership. A. I told the clerks to announce it. I took the keys, and notified the clerks, every clerk in the house."

He further testified that there was nothing that he considered a sign, either on the inside or outside of the store; that he didn't know that he removed anything; that it was his impression that he moved some things to one side, in the way of advertisements, but could not say what they were.

The interpleader testified, in answer to question by her counsel:

"Q. How did you take possession? A. I authorized the clerks to sell no goods; I told the clerks the goods were mine; that Mr. Sally had given me a chattel mortgage and that the property was mine, and for them not to sell any goods in Mr. Sally's name." That she remained in Lecoma until five o'clock that afternoon, and started for her home in Rolla about four or five o'clock that evening, and was never back at Lecoma until after the goods were attached; she never took any invoice of the goods; never closed the store for any purpose; there was no sign put in the store in her name;

that she didn't know anything about what sales were afterwards made; that she left the same three clerks in charge of the store that her husband had; she designated no particular one to have charge.

*Pat Smith,* one of the clerks in charge, testified that he was employed in and around the store from the time of Mrs. Sally's early call in the morning of the 22nd of October until the sheriff levied on the 25th; that Mrs. Sally told him the goods belonged to her and employed him to work for her; the first thing he did was to run a red line under the standing accounts, and then sold goods and transacted business until the sheriff took possession four days later. He knew nothing of "any change made or attempt made to get a sign made. Did nothing himself to that end." He did tell *inquiring customers* "that it belonged to Mrs. Sally, Jim Sally's wife," and "that it was run in her name. She did not take any invoice. No sign was put up that she was mortgagee in possession."

"Q. Was there anything done in or about the store to indicate that she was the owner of that store, or in possession as mortgagee, or anything to indicate to the public that the public coming there would know who was in possession of the stock of goods? A. Nothing that I know of.

"Q. Was anything torn down on the inside of the store? A. I don't remember that there was.

"Q. No visible signs or visible marks there to show who was the owner of the store, was there? A. I think not.

"Q. No difference in the management. The same clerks remained in there? A. No change in management or clerks whatever."

He further testified that "first saw Mrs. Sally on the morning of October 22, about seven o'clock." "Did not see James Sally that day." John Sally told him James B. Sally was no longer in business, and that Mrs. Sally was in the store. Mrs. Sally told witness

she wanted him to work for her. "Nothing said about wages." "After Mrs. Sally took possession we used the same books, sales book, day book and ledger." "Never made any changes in the books after October 22nd." Didn't see any sign sitting out on platform.

*E. L. Taylor* testified that one Chamberlain had made a signboard on which he, Taylor, was to do lettering, but no lettering had ever been done, and the board was at Chamberlain's mill. He further testified that he saw a sign which some one had told him was sent out from Rolla. It was about the platform of the store on Saturday night, the 23rd of October about sundown. It was about four feet long, and had on it "Mrs. Sarah H. Sally's Store." He had not put it there, and didn't know how it came there. It was never put on the building, and he only saw it once. It was not there on Friday, nor on the following Monday. Lenox testified he saw such a sign, but could not remember whether it was before or after the attachment, and that outside of this sign he saw nothing inside or outside to indicate a change of ownership.

*Pat Smith,* recalled, for cross-examination, testified he was there all the time and saw no such sign as Taylor described.

For the plaintiffs:

*C. H. Fauntleroy,* an attorney of St. Louis, representing the Brown Shoe Company, a creditor, testified, that he was at the store at Lecoma from twelve to two o'clock Saturday and there was no sign about the premises; that he examined particularly.

*Charles L. Woods,* an attorney of Rolla, testified he was there for eight hours on Monday, the 25th of October, and there was no sign there, or any other indication of a change of possession.

*Wm. Biebinger,* a St. Louis creditor, was there on Monday, the 25th of October, from six in the morning until noon, and there was no sign or anything else to indicate Mrs. Sally's possession.

*E. Y. Mitchell* of Rolla testified he was there all day on the 25th of October, and there was no sign.

Mrs. Sally and her attorney, Mr. Harrison, who was managing the matter for her, gave no testimony as to the said sign. There was no evidence that either of them had employed anyone to make a sign in Rolla, or that either of them sent one out to put on the store.

Giving a fair and reasonable weight to all the testimony on the whole case as to the change of possession, and full credence to all the testimony offered by interpleader on this branch of the case, was there that open, notorious, unequivocal and continued change of the possession of the stock of goods from James B. Sally to his wife, which the statute requires as against Sally's creditors?

No invoice was taken, no sign was put up, no written or printed notice posted in the windows or on the doors to indicate Mrs. Sally had taken and was in possession as mortgagee. No change was made in the clerks who had been selling the goods for her husband. Mrs. Sally only remained at Lecoma a part of the 22d, and was never there again until after the sheriff had seized the goods under the attachment. The chattel mortgage was not recorded in the county where her husband resided, as the statute required.

No new set of account books was opened in her name; merely a red line drawn under the accounts due up to that day. It is true one Taylor testified to a sign having been seen on the platform for a short while Saturday evening after the alleged change on Friday, but all the evidence establishes that it appeared without the sanction of either Mrs. Sally or her counsel, neither of whom made the slightest pretense of being responsible for such a sign and no verdict could stand upon such a fragment of evidence as this was as to the putting up of a sign. Even if it was there a few short hours Saturday night, it lacked all the essentials of a continuous

assertion of a change of possession, as all agree it was gone Monday.

In Lesem v. Herriford, 44 Mo. 325, this court held that the change must be "such as to preclude the hazard of the seller deriving a false credit from the continuance of his apparent ownership."

Bump in his work on Fraudulent Conveyances (4 Ed.), section 127, lays it down that "the change of possession must be such as is observable without inquiry." No other rule will work out the purpose of the statute. Hence, the evidence of Smith, the defendant's clerk, to the effect that he told such of the customers as inquired that Mrs. Sally was in charge, and it was being run in her name, was not sufficient by itself to effect the required change. He testified that, outside of his answers to those who inquired, there was nothing whatever to indicate to the public that Mrs. Sally was the owner or in possession of that stock as mortgagee. To all appearances everything remained after the alleged change of possession just as it had been for weeks prior thereto. Even if doubtful, the law resolves the doubt against the party who should make the change of possession open and visible to the world.

It results that the court erred in refusing to sustain the demurrer to the evidence. Having reached this conclusion, after a careful consideration of the record, we deem it unnecessary to consider critically the remaining assignments further than to say that the statements of counsel for interpleader were entirely improper, and should have received the prompt reprimand of the circuit court. The attaching creditors were pursuing their lawful actions to collect their claims which the evidence tended to show very strongly that the defendant Sally was endeavoring to defeat and delay, and they had done nothing to justify counsel for interpleader and defendant denouncing them as "speculators, driving sharp bargains." The judgment is reversed and the cause

remanded to be tried in accordance with the views herein expressed. *Robinson, C. J.,* and *Burgess* and *Valliant, JJ.,* concur.

SEPARATE OPINION.

FOX, J.—I fully concur in the very able opinion of my brother GANTT in this cause, except as to the conclusions reached in paragraph two, "that the court erred in refusing to sustain the demurrer to the evidence."

This conclusion was reached upon the theory that the chattel mortgage, not having been recorded in the proper county, conveyed no notice whatever to the creditors of James Sally, hence it devolved upon the interpleader, in order to maintain her right of recovery, to prove to the reasonable satisfaction of the jury, "that the possession of the mortgaged goods had been delivered to and retained by her," and that the evidence on the part of the interpleader, in respect to the change of possession, was insufficient to authorize the court to submit that issue to the jury.

With the greatest deference to the opinion of Judge GANTT, I have, after a careful consideration of the evidence, reached a different conclusion.

It must be conceded that it is the settled law, as applicable to the mortgage in this case, that there must be an actual and visible change of possession of the mortgaged property, from the mortgagor to the mortgagee, before the rights of other parties intervene. It must also be noted that, in determining the question of such change of possession, due regard must be given to the situation and character of the property. This issue was sharply presented in the trial of this cause. Upon this issue I shall not recite in detail all the evidence on the part of the interpleader as to the actual delivery and visible possession taken of the property embraced in the mortgage; it will suffice to indicate such

testimony as would authorize the trial court to submit that issue to the jury.

James B. Sally and his wife resided in Phelps county. The stock of goods was situated in a storehouse at Lecoma, a small village, distant about ten or twelve miles from Rolla in Phelps county. It was the only store in the village. On the 19th of October, 1897, an invoice of the stock of goods was completed. On the night of the 21st of October the mortgage was executed to the interpleader, embracing the stock of goods. On the morning of the 22d of October, James B. Sally, with his wife, and attorney J. B. Harrison, whom the interpleader had employed as her attorney, went out to the store. She went into the store, announced to the clerks that the stock of goods was hers; gave them directions what to do, and took possession of the store and goods, remaining there all day. Mr. Harrison, who was representing the interpleader, directed that a sign be made and placed on the store. The clerks informed the customers that came in the store of the change of possession. The mortgage to the interpleader embraced all the accounts; hence the interpleader retained the same account books, they were hers, and as to transactions with her, the accounts were kept in the old books; but the books were made to indicate the business transacted with her. The people around the little village knew of the change and were told of it. Pat Smith, one of the clerks, testified. He says: ''During the whole day and from that time until the store was closed by the sheriff, it was the general talk there. . . . We had to explain it all the time by customers asking the question. . . . I don't know what the reason was for asking, unless they knew of the change.''

As to the sign being placed on the store porch, the testimony is as follows:

J. B. Harrison (who represented the interpleader in the transaction), testified: ''I instructed John Sally

to have a sign made as soon as possible to put up on the store."

*E. L. Taylor* (who was employed in the mill) testified as follows:

"Q. State what you know, if anything, about a sign being prepared. A. There was a sign made, but it was never finished at all before the sheriff closed the store; it was commenced, but the paint had not got dry, and the lettering could not be done. In the meantime there was a sign sent out from Rolla, and it is there yet, and I guess it can be produced.

"By the court: Q. This sign you spoke of being partly prepared, was not put up at the store? A. No, sir; it never was finished.

"Q. Where was it kept while it was being worked on? A. Mr. Chamberlain made the sign, and I was to do the lettering on it, but it was never finished; the paint had not got dry and it could not be lettered.

"Q. Where was it kept while it was being worked on? A. It was kept at the planing mill of Mr. Chamberlain.

"Q. It was not kept at the store? A. No, sir.

"Q. What was done with the sign that was sent there from Rolla? A. It was about the platform at the store there on Saturday night, Mr. John Sally told me— Mr. Dickey (counsel for plaintiff) here interrupted the witness.

"Q. Did you see it placed upon the platform? A. No, sir; but I saw it there.

"By the court: Q. In what position was it when you saw it? A. It was sitting up, leaning up against the house.

"Q. In such a position that it could be read? A. Yes, sir.

"Q. By anyone passing? A. Yes, sir."

*J. M. Lenox*, at whose house a good many of the representatives of the creditors and their attorneys stopped while at Lecoma, on Monday, the day of the

levy, testified as follows, after saying that he remembered the day that Mrs. Sally and Mr. Harrison were at Lecoma, and took possession of the stock of goods:

"Q.   Did you see any sign after that day around the store or premises?   A.   I did.

"Q.   State what was on the sign and where it was?   A.   I don't remember whether I seen that sign before the store was closed down or afterwards.   There was a sign there on the porch.   It was a small board, probably four feet long, I could not tell the width of it, with 'Mrs. Sarah H. Sally's Store' on it.   The sign was afterwards at my house and lay on the portico for awhile. It was on the porch, but how it came there, I don't know.'

"Q.   That was after the goods were attached that it was at your house?   A.   Yes, sir; after the goods were attached.

"Q.   Did the sheriff stop at your house?   A.   No, sir; he stopped at Porter's; a good many of the other gentlemen that were there stopped at my house."

And on cross-examination Mr. Lenox testified in part as follows:

"Q.   Where was the sign when you saw it?   A. On the porch.

"Q.   That was after the store closed?   A.   I could not say whether it was before or after the store was closed down.

"Q.   Your best recollection is that it was afterward?   A.   My best recollection is that it was there before the store was closed, but I might be mistaken.

"Q.   What porch was it on?   A.   The porch in front of the store, when I first seen it.

"Q.   You would not swear when you first saw it there?   A.   No, sir; I would not swear positively.

"Q.   Might it not have been put there after the store was closed?   A.   It could have been, but my impression is that I seen it before the store was closed, but I could not be positive."

The interpleader, Mrs. Sally, when she went out to the store to take possession, says:

"I authorized the clerks to sell no goods—I told the clerks the goods were mine; that Mr. Sally had given me a chattel mortgage and that the property was mine, and for them not to sell any goods in Mr. Sally's name; that all the business should be carried on in my name from that time on."

While this is not a full and complete statement of all the testimony, it is sufficiently indicated to determine the correctness or incorrectness of the action of the court, in submitting the issue to the jury, to which that testimony was applicable.

It was the province of the jury and not of this court to determine the credibility of the witnesses testifying in this cause, and the weight to be attached to their testimony.

The proposition that, where there is any substantial evidence tending to prove the matters in issue, or evidence from which the ultimate fact to be proven may reasonably be inferred, it is the duty of the court to submit such issue to the jury, is so firmly settled by the unbroken line of expression of opinion of this court, that it seems unnecessary to do more than to state it.

In the case of Donohue v. Railroad, 91 Mo. l. c. 360, this court said upon the subject now being discussed: "A demurrer to the evidence admits the facts the evidence tends to prove, and, in passing upon it, the court is required to make every inference of fact in favor of the party offering the evidence which a jury might, with any degree of propriety, have inferred in his favor."

To the same effect is Kelly v. Railroad, 70 Mo. l. c. 607. It was said by this court: "As there was some evidence, although slight, tending to show that Kelly was killed by the eastern-bound train on which he was a passenger, at the station in Mooresville, the question

Vol 176 mo—10

should not have been withdrawn from the jury, but submitted under appropriate instructions."

The same was ruled in case of O'Hare v. Railroad, 95 Mo. l. c. 667. The court very clearly announced the rule. It said: "In passing upon a demurrer to evidence the court is required to make every inference of fact in favor of the party offering the evidence which can reasonably be made."

That we may fully appreciate the extent to which this court is committed on this subject, see the announcement of the rule in case of Buck v. Railroad, 108 Mo. l. c. 186. It said: "In determining whether the cause should go to the jury, we must give the plaintiff the benefit of the most favorable view of his facts and of every reasonable inference therefrom. So viewed, we think this case is one for triers of fact to decide, and that there was no error in submitting it for their action."

Applying the rule as announced in these cases, in my opinion, the evidence offered by interpleader was sufficient to authorize the court to submit that issue to the jury. This cause should not be reversed on account of the action of the trial court in refusing to give the peremptory instruction in the nature of a demurrer to the testimony.

In the examination of this record, my attention was directed to the complaint of appellant, in respect to improper remarks of counsel for interpleader in their argument to the jury. As to what counsel said will be best understood by quoting from the record:

"In the argument of J. B. Harrison, Esq., on behalf of interpleader, said J. B. Harrison, Esq., used the following language, to-wit: 'She [meaning interpleader] did no more than these speculators in St. Louis would have done.'

"The said J. B. Harrison, attorney for interpleader, in further argument to the jury of said cause, and by way of answer to the objection previously made to the language used by him, used the following lan-

guage, to-wit: 'These merchants, speculators and creditors from St. Louis who by their conduct show a disposition and capacity to drive a sharp bargain, if that will satisfy the gentlemen. . . . If James B. Sally, the husband of interpleader, had not given his wife the note and chattel mortgage, he would have been more meaner and more treacherous than these speculators in St. Louis.'

"And in the further argument of said cause to the jury by G. S. Dugan, Esq., on behalf of the interpleader, said counsel for interpleader used the following language: 'Gentlemen of the jury, who is ablest to live without this? Who is ablest to live?'"

To this improper argument, counsel for appellant promptly objected, and earnestly appealed to the court to rebuke counsel. The court refused the request of appellant, and so far as the record discloses, did not even intimate that the language used was improper. To this action of the court, appellant has in due form preserved his exceptions.

So far as the record discloses in this case, the appellant is a firm of reputable business men in the city of St. Louis; they were simply resorting to legitimate legal methods of enforcing their claim against a creditor. In my opinion, the language used by counsel in their argument to the jury was highly improper, and calculated to endanger a fair and dispassionate consideration of the testimony applicable to the issues submitted to the jury. Their reference to the appellants as being mean and treacherous, their intimations that they were sharps and speculators, and finally the appeal to the prejudices of the jury by an intimation as to the financial standing of the parties to this suit, were unwarranted by the facts in this case. While it may be commendable in counsel for Mrs. Sally who it is claimed, in this legal contest, is fighting for a fragment of her inheritance, to grow earnest, yet this earnestness and

deep feeling, in the interest of their client, must be manifested by appropriate methods.

The inclination of this court, as frequently expressed, is to defer to the action of the trial court, in passing upon motions for new trial, where the conduct of counsel is urged as one of the reasons in the motion, but this does not mean that this court will sanction the absolute disregard of a litigant's right to have a fair and dispassionate consideration of his case.

The condemnation of this error complained of by appellants is very forcibly and appropriately expressed by GANTT, J., in Haynes v. Town of Trenton, 108 Mo. l. c. 133. He said:

"The disposition of this court is to permit the greatest latitude in the argument of a cause to a jury. But its disposition to trust largely to the discretion of the trial courts must not be construed that we will, on that account, tolerate the clear disregard of a litigant's right to have his cause heard and tried according to the law of the land. The conduct of counsel for plaintiff in making these and other similar statements can not be excused. Counsel will not be permitted to wring verdicts from juries by statements of matters extraneous to the record, and rely upon our disinclination to interfere."

It was the plain duty of the court upon the objection of appellants, to have expressed its disapproval of the objectionable remarks of counsel, in the presence of the jury, in such sufficiently emphatic language as to destroy any impressions which may have resulted from the use of them.

Its silence and failure to do so, in my opinion, was error, which should result in the reversal of the judgment, and remanding the cause for a new trial.

For the reasons herein expressed, the judgment is reversed and the cause remanded for a new trial.

*Marshall* and *Brace, JJ.,* concur.