# CLARA MUELLER, Appellant, v. EDWIN J. BECKER et al.

## Division One, December 31, 1914.

1. **DEED OF TRUST: Sale: Duty of Trustee.** A trustee under a deed of trust may divest himself of the title and of all the responsibilities with which he is charged, by a fair sale of the property in compliance with all the terms of the instrument, so that no interest remains in him or in any one representing him or represented by him, and he may then deal with the property as any other stranger to the title, but if he repurchase it, equity will look with a suspicious eye upon the transaction and jealously scrutinize it to ascertain whether he has used the powers given him for the benefit of others to facilitate its acquisition for himself.

2. ——: ——: ——: **Redemption: Setting Aside Trustee's Deed: Laches: Coverture.** In settlement of a suit by attachment brought by the Pabst Brewing Company, and in which there was a levy upon land held in the plaintiff's name, she and her husband in 1895 executed in favor of the company a second deed of trust, for $1064, and named the company's local attorney as the trustee. The trustee sold under this deed in 1896 and conveyed the land to the company. When in 1898 the land was about to be sold under the prior deed of trust, given to secure a debt of $1500, the company's local manager urged the company to bid it in, but it refused to do so. At the sale the company's manager and local attorney together bought the land for $1710, the actual value then being perhaps $3800. They then offered it to the company at the price they had paid, and the company again declined to take it. Notice to quit was then given plaintiff's husband in the name of the company, and in answer to a request for more time the company wrote that it could do nothing, since the manager and the attorney had become the owners of the land. In October of that year the plaintiff and her husband surrendered possession. In 1908 the plaintiff sued to set aside the trustees' deeds and to redeem. *Held*, that plaintiff's rights in the premises, if any she had remaining, are barred by her delay in bringing suit, and her coverture does not excuse her delay.

Appeal from Jackson Circuit Court.—*Hon. Thomas J. Seehorn*, Judge.

AFFIRMED.

*William C. Forsee* for appellant.

*Beardsley, Schaich & Beardsley, J. E. Forrence* and *Hadley, Cooper, Neal & Wilson* for respondents.

BROWN, C.—This suit was instituted August 20, 1908. The amended petition was filed at the October term, 1909. Its general object is to secure the cancellation of two trustee's deeds; one from Wash Adams, trustee, to Pabst Brewing Company, dated May 28, 1897, and the other from William S. McLeod, trustee, to Edwin J. Becker, dated June 3, 1898. It also seeks an accounting, to redeem from the deed of trust under which the McLeod sale was made, and for general relief, and offers to do and perform "whatever the court ought in equity to require." It also asks "that plaintiff's title to said lands as against each of the defendants be confirmed and established," and for general relief.

The defendants are Edwin J. Becker, William B. Conrod, John R. Wilson, A. L. Cooper, M. M. Sweetman and Pabst Brewing Company.

Becker answered claiming title through the trustee's sale mentioned, and alleging that he had conveyed an undivided one-half of the land to the defendant Conrod, denying the other allegations of the petition, and pleading the ten-year statute of limitation of actions for the recovery of lands.

Wilson, Sweetman and Cooper answered, claiming under a deed of trust to the first named as trustee to secure the payment of notes aggregating $2000 to Cooper and Sweetman, given before the institution of this suit for money loaned Becker. They also claim that to that extent they are innocent purchasers, without notice of any claim of plaintiff.

Conrod answered, denying the allegations of the petition, and stating, among other things, that Becker, on June 21, 1901, conveyed an undivided one-half of

the land to Adams for $1000, and that Adams, on December 29, 1904, conveyed the same undivided half to him (Conrod) for $3500; that he purchased in good faith without any knowledge of any adverse claim either legal or equitable; and that plaintiff had been lax in asserting her alleged right; and asked that the court ascertain, determine and adjudge the title and interests of the parties, and for general relief.

Issue was joined by replication, and the cause went to trial on these issues. The principal facts in evidence are as follows:

August Mueller, who was the husband of plaintiff, was on February 25, 1893, the owner of the thirty-acre tract of land in controversy, and on that day his wife joined him in a deed of trust conveying it to W. D. McLeod, trustee, to secure payment of a note to James McKensie, for $1500, due five years from date, with 6 per cent interest evidenced by semi-annual coupons. In January, 1894, Mr. Mueller caused the land to be transferred through one Schwecten to the plaintiff, subject to the McKenzie deed of trust. On January 19, 1895, plaintiff and her husband joined in a deed of trust to Wash Adams, trustee, to secure a note of that date for $1064, signed by both, and payable to Pabst Brewing Company one year after date. This represented a balance which Mr. Mueller owed the brewing company on settlement, and upon which a suit by attachment was pending at the time the deed of trust was given. Mr. Adams was, at the time, local attorney for the brewing company at Kansas City, and continued to be until after 1898. The defendant Becker was the manager of what was called the Kansas City Branch of the company continuously from January 1, 1890, until June, 1900, and as such had general supervision of its collections and the enforcement of the payment of debts due it, taking the initiative unless specially instructed by the company. He does not remember informing the company of this transaction at

any time before the sale under the Adams deed of trust, nor does he remember who got that deed from Mueller and wife. Such transactions were generally handled by the attorney, from whom he would get his information.

The land was sold by Adams, subject, of course, to the McLeod deed of trust, on May 16, 1896, and a certificate of purchase was made on the 18th to the Brewing Company as purchaser, in which its bid was recited as $500; and $450 was credited by Mr. Adams on the note as the net proceeds of the sale.

The evidence of the cash value of the land at the time of these transactions takes a wide range, but the estimate of Becker in a letter to his company, of $3812.50, is probably fair.

On May 17, 1897, Mr. Adams wrote the Pabst Company "that pursuant to the powers vested in him as trustee in the deed of trust to secure the $1064 note, he had on May 16, 1896, sold the land; that the same had been bid in by the local representative of the company in the name of the company; that he had thereupon executed a certificate of purchase, and that unless the land was sooner redeemed, he would at the expiration thereof execute a deed to the company, as grantee, and asking that the certificate of purchase and the original deed of trust be returned to him in order that he might execute a trustee's deed." There was no answer to this, and there is no evidence that it was mailed or received. It does not appear that up to this time the home office of the company had any information that there had ever been any such thing as the Mueller deed of trust. On the 28th of May, Mr. Adams made and acknowledged his trustee's deed to the company, and it was recorded the 1st day of June following. Then, on August 17, 1897, Becker wrote the company as follows:

"Kansas City, Mo., Aug. 17/97.

"Pabst Brewing Co.,

"Milwaukee, Wis.

"Dear Sirs:

"We are the owners of a farm in this (Jackson) county of 30½ acres which came into our possession on a foreclosure of a second deed of trust given us by Aug. Mueller. The second deed of trust stands on our books $1062.33. There is a first mortgage on this farm of $1500. After getting title to the same I placed it in the hands of a real estate agent to sell, not naming any figure at that time. This agent was aware of what we had against it at the time the foreclosure was made. A few weeks ago he called and asked if we would take $2700 for the farm. I refused the offer and asked him $125 per acre, which would be $3812.50 for the farm. The agent was at the office this morning and made a proposition for one Aug. Sehstedt in which he asks us to rent him the place at $200 per year and give him the privilege at the expiration of three years to purchase the farm at $125 per acre. I informed him that I would lay his proposition before you and give him an answer as soon as I heard from you. The party of course expects by this proposition to receive the benefit of any increase in valuation on this farm. I do not think $125 per acre is too much at this time, whether it would increase in three years from now it is hard to say. If we should rent him the farm at $200 per year we would be obliged to take up the $1500 deed of trust when it becomes due. The party holding the first deed of trust of $1500 has also paid some back taxes. In all I find, according to my figures it would not cost us to exceed $2700, including our account. The farm is located about seven miles from Kansas City. Will you please give this your early consideration and reply.

"Yours respectfully,

"E. J. Becker, Manager."

This brought the following answer under date August 19, 1897:

"Mr. E. J. Becker, Pabst Brewing Co.,
    "Kansas City, Mo.
"Dear Sir:
    "In reply to your letter of the 17th inst., beg to state that we do not care to rent the farm, but authorize you to sell it if you can get out the money we have invested in the farm. We do not wish to hold the farm any longer than necessary. If you cannot get more than $2700 accept that amount and notify us what you have done.
                    "Yours truly,
                        "PABST BREWING COMPANY,
                            "By M. H."

On November 12, 1897, Becker wrote the company:
    "We herewith hand you trustee's deed from Wash Adams to the Pabst Brewing Co., made on the 20th day of May, 1897, properly recorded in the recorder's office Jackson county. This is for 30½ acre farm for claim had against Aug. Mueller, subject to an encumbrance of $1500."
    The company answered on the 15th as follows:
    "In reply to yours of the 12th inst., we would request you to send us all the papers, such as abstract, etc., pertaining to the August Mueller farm, as you may have, also give all particulars relating to this case, and the full amount you expect to credit to August Mueller. If there is a mortgage of $1500 ahead of our claim on thirty and one-half acres of land, we do not see what we can possibly gain by accepting the trustee's deed."
    Other correspondence followed, which resulted in the Pabst Company definitely declining to take up the McKenzie deed of trust although strongly advised by Mr. Becker to protect itself by doing so. The land was finally advertised for sale under that deed and sold on

June 3, 1898, Becker becoming the purchaser for himself and Adams under a previous arrangement made between them for that purpose. A trustee's deed was made to Becker the same day. On the following day both wrote the company. Mr. Becker's letter is as follows:

"Kansas City, Mo., June 4/98.

"Pabst Brewing Co.,

  "Milwaukee, Wis.

"Dear Sirs:

  "On Thursday, June 2d, I wired you asking for instructions in regard to the sale of the Mueller farm by foreclosure, to which you replied on June 2nd: 'We do not desire to purchase first mortgage.' I wish to say that this property was offered for sale by the trustee named in the deed of trust and was sold yesterday for $1710. The first mortgage was for $1500 and the expenses attached to the sale outside of the sum named above, interest, taxes for last year and cost of foreclosure, which in all would amount to from $100 to $110. Myself and Mr. Adams considered the property was being sacrificed and privately bought the same in at $1710, having borrowed the money from the bank for thirty days on a joint note, interest of which is $11.73. We believe that we will be able to dispose of this property, otherwise would not have bought it, within the time named. Thought however we would inform you of the facts in the case and if you desire to take the property, to let you have it at the cost of the same which would be $1710 plus $11.73 for interest and $1.25 for filing the deed, making a total of $1722.98. Of course $100 of this money would not have to be paid as that is about the amount that would be coming to the company whether or no you take the land. I thought I would place this matter squarely before you and think possibly the company might save a little more out of it. Mr. Adams and myself are perfectly willing to hold the same for our account if

the company does not want it. I felt it was my duty to protect you as far as I could, therefore attending the sale and made this bid. Should the company hold to the position taken in their telegram of June 2d, we would pay over the amount above the first deed of trust and the expense attached thereto which, as I said before, would be from $100 to $110, leaving a balance of about $100 coming to the company. Will you please let me hear from you at your earliest convenience.

"Yours respectfully,

"E. J. BECKER, Manager."

Mr. Adams wrote as follows:

"Kansas City, Mo., June 4, 1898.

"Pabst Brewing Co.,

"Milwaukee, Wis.

"Dear Sirs:

"On yesterday I was informed by Mr. Becker that you refused to purchase the August Mueller thirty acres, about five miles southeast of Kansas City, and was willing to sacrifice the interest you had in the property, amounting to about one thousand dollars. Mr. Becker and I thereupon determined to buy the property ourselves. I bid it in for $1710. Of this amount about $90 will be coming to you, the balance going to pay the first mortgage and expenses of sale.

"Being your attorney here I deem it wrong to take advantage of my position as such. I therefore suggested to Mr. Becker, he being also your agent, that we forego our purchase and offer you the privilege of taking the property, if you so desired, at just what we bid it in.

"Mr. Becker has written you, no doubt, to the same effect. We bought this property because we considered it a good investment. If you wish to have the

property conveyed to you we will make the conveyance.

"Please let me know your decision in the matter.
"Truly yours,
"WASH ADAMS."

The answer to these was addressed to Mr. Becker, and is as follows:

"June 7, 1898.

"Mr. E. J. Becker, Manager Pabst Brewing Co.
"Kansas City, Mo.

"Dear Sir:

"In reply to yours of the 4th inst. we wish to thank you for offering the Mueller property to us. At the same time however, we do not wish to purchase it. Also thank Mr. Adams in our name.
"Yours truly,
"PABST BREWING Co.
"FRED PABST, JR."

Notice signed by the Pabst Brewing Company was then given the Muellers to quit and surrender possession to the company, and saying that the land had been bought in by the company at that sale. Mr. Becker says he knows nothing about this notice, but that Mr. Adams was his personal attorney as well as the attorney for the company. A copy of this notice sent by Mueller to the Pabst Company at Chicago brought the following response, dated September 6, 1898, and signed by Mr. Fred Pabst, president of the Brewing Company, which the respondents have translated from the original German:

"Your letter of the first of this month I have received and have taken notice of its contents.

"As I wrote you in my former letter, there is nothing I can do for you in this matter. Messrs Becker and Adams are owners of these lands, and they are responsible for their dealings. I will write to Mr.

Becker and ask him to give you the requested time, till October.''

The Brewing Company also wrote the Kansas City agency on the next day as follows:

"September 7, 1898.

"Pabst Brewing Co.,

   "Kansas City, Mo.

"Gentlemen:

"If you can consistently grant the wish of the writer of the enclosed letter to let him stay on the farm that has been sold by the sheriff on foreclosure proceedings until the first of next month, you will oblige me. I note that the 'notice to quit' sent to Mueller is signed Pabst Brewing Co., by Charles B. Adams, its attorney. Was the property bought in our name? Please let us hear from you in the premises.

    ·"Yours truly,

    "PABST BREWING Co.,

   ·"By FRED PABST, President."

The Muellers surrendered the possession of the farm to Becker the same fall in October. Becker by quitclaim deed dated June 21, 1901, conveyed an undivided half to Adams. Mr. Mueller died November 15, 1907.

The amount received by the Pabst Brewing Company as the surplus resulting from the McLeod sale was about $90. While it seems to be admitted that two o'clock was the usual hour for making sales of land at the courthouse in Kansas City, where these trustee's sales took place, Mr. Kreisel, who went to bid on the land at the McLeod sale, but failed at the last moment to obtain the necessary funds, was there at the bidding, and testified positively that the sale took place at about half past ten in the morning. He also testified that within a very few minutes after the sale was completed, and while the people who attended it were standing there, Mr. Mueller came up the steps

from the yard with a man carrying a black bag, and said he had a man who wanted to bid. Nothing more was said and the men who were at the sale dispersed. The plaintiff and two of her sons testified that Mr. Mueller started to town, ostensibly to attend the sale, early in the forenoon and that he returned about one o'clock. It took about an hour and a half to travel from the courthouse to the farm. On the other hand, Mr. Barber, a bidder, testified that it took place at about half past two and Mr. McLeod, the trustee, and Mr. Becker testified to their own recollection that it took place at two o'clock.

The Pabst Brewing Company, by its quitclaim deed dated December 6, 1909, conveyed all its right, title and interest in the land in controversy to the plaintiff.

At the completion of the trial, April 27, 1910, the court rendered its judgment in which it found the issue for the several defendants and against the plaintiff, concluding after describing the land as follows: "That plaintiff has no claim or equity to the same, or any interest whatever, legal or equitable, therein; that defendant Edwin J. Becker is the owner in fee simple of the undivided one-half interest in said premises subject only to the deed of trust now on record in favor of John E. Wilson, trustee for A. L. Cooper; that defendant William B. Conrod is the owner in fee simple of the undivided, unincumbered one-half interest in said premises. Wherefore, it is ordered, adjudged and decreed that plaintiff take nothing by her suit herein, and that defendant William B. Conrod is decreed the owner in fee simple of the undivided, unincumbered one-half interest in said premises; that plaintiff pay the costs of this suit, and that defendants have therefor execution."

I. The facts above stated present some very interesting questions which we will not undertake to de-

cide; for, in front of them all stands the question whether Mrs. Mueller can now call for their consideration. Has she, by her own delay, elected to leave the transaction in the very situation of which she now complains?

Deed of Trust: Sale: Duty of Trustee.

In answering this we must bear in mind that whatever rights the plaintiff may have depend upon the continued existence of the relation created by the deed of trust to Mr. Adams. That instrument defined the nature and extent of the trust and the manner in which the trustee might divest himself of the title and all the responsibilities with which he was charged with respect to it. That this would be accomplished by a fair sale of the property in compliance with all the terms of the instrument, whether expressed upon its face or implied by law from the relation it created, so that no interest would remain in him or in any one representing him or whom he in any way represented, there can be no doubt. That he would then be at liberty to deal with the property as any other stranger to the title is plain. But if he should repurchase it, equity would look with a suspicious eye upon the transaction, and jealously scrutinize it to ascertain whether he had used the powers given him for the benefit of others to facilitate its acquisition for himself. [Perry on Trusts (6 Ed.), sec. 187 and cases cited.]

Mrs. Mueller knew whether or not Mr. Adams had properly executed his trust and discharged himself from responsibility as her trustee. She knew it because she was aware of all the facts connected with the transaction and the law will presume that she knew their legal effect. It is impossible to conceive that she did not know that the mortgage she was executing was made to secure a debt already in suit, and for which her own land had been attached, and that the trustee was the attorney of the mortgagee. The trustee's deed was not void. Admitting her claim to the

fullest extent, it was only voidable at her election. No outsider could interfere. It followed that it was her duty, if she desired to avoid the transaction, to make her election within a reasonable time. [Perry on Trusts (6 Ed.), secs. 602 and 198.] For the first two years, during which there was no change in the situation, she waited, no doubt, with the reasonable hope and expectation that the mortgagee, which was the purchaser at that sale, would make no objection to her redeeming the property if she could raise the money to do so. At the end of that time her husband, who acted for her as well as for himself throughout the transaction, received the Pabst letter, which conveyed to them the information in unmistakable terms that they could expect no further favors; that the property had already passed into the hands of those who had already joined in what she alleges to be the violation of a trust. They were invested with a perfect and merchantable legal title and the same public policy which encourages the stability and safety of such titles by laws requiring them to be created and shown in visible and permanent form, and providing public records for the preservation of evidence relating to them, demanded that Mrs. Mueller, who had the right to make an election which would overthrow these muniments and destroy these safeguards, should make it without unnecessary delay.

This neglect involves something more than the passive delay by which one becomes barred of the enforcement of his rights by the Statutes of Limitation. In this case he has no **Setting Aside Trustee's Deed: Redemption: Delay.** right unless he elects to purchase it, and to pay for it by the surrender of another right, the right to insist that things continue as they are. For example, if when the Adams sale occurred, the brewing company had delayed to accept

it, and to give the proper credit for the proceeds, the Muellers could have forced them to do so. [Perry on Trusts (6 Ed.), sec. 198.] They would then have sold their right to maintain a suit of this character, by the process of waiver or estoppel, it makes no difference what we call it. But had they at that time disaffirmed the sale, had they the right to do so, they would have sold their right to the purchase price and could proceed in equity to have it set aside. It would have cost them whatever they would have been entitled to under the sale. The reasonable time the law gives them to make this choice has no relation to the time allowed by the Statute of Limitations to bring an action, except that "a cause of action accrues for the purpose of setting the statute in motion as soon as the creditor, by his own act, and in spite of the debtor, can make the demand payable." [Landis v. Saxton, 105 Mo. 486.] These statutes do not operate as an inflexible definition of what constitutes a reasonable time in which to perform those duties to others which grow out of our contractual and business relations, and which depends necessarily upon the peculiar circumstances of each case. In this case more than twelve years elapsed from the time of the Adams sale and more than ten years from the time of the McLeod sale before Mrs. Mueller first attempted to exercise her right of election by the bringing of this suit. We think this amounted to an affirmance of both those transactions, unless her coverture during all the time up to November 25, 1907, excused her inaction.

II. That Mrs. Mueller, notwithstanding her coverture, was *sui juris* with respect to this transaction, cannot be seriously doubted. Although Coverture. the unlimited right to transact business on her own account, to contract and be contracted with, to sue and be sued and to enforce and have enforced against her property judgments for and against her,

with which she is clothed by the Act of 1889 (R. S. 1909, sec. 8304) does not repeal her statutory exemption from the operation of the Statute of Limitations, it carries with it all the incidents necessary to make those rights available. With respect to all those things she is to be deemed a *feme sole,* even as to her husband, with whom she may deal at arm's length as with a stranger. [Rice, Stix & Co. v. Sally, 176 Mo. 107; O'Day v. Meadows, 194 Mo. 588, 614; Bower v. Daniel, 198 Mo. 298, 320; Donovan v. Griffith, 215 Mo. 149; Harvey v. Long, 260 Mo. 374.] With reference to both rights and duties she is placed on an equality with those with whom she deals. One of the duties growing out of the trust relation she created, was the duty to elect within a reasonable time to disaffirm the action of her trustee both with respect to the sale made by him, and his purchase with Becker at the McLeod sale, had it been open to any objection authorizing such disaffirmance.

The conclusions at which we have arrived make it unnecessary to examine the numerous other suggestions made by appellant in her brief and argument. The judgment of the circuit court will have to be and is affirmed. *Blair, C.,* concurs.

PER CURIAM.—The foregoing opinion of BROWN, C., is adopted as the opinion of the court. All the judges concur.